UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

JESSICA BALDWIN                                                                                    PLAINTIFF

V.                                    NO. 3:16CV00341-JTR

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration                                                         DEFENDANT


# ORDER

## I. Introduction:

Plaintiff, Jessica Baldwin, applied for disability benefits on December 4, 2013, alleging an onset date of December 28, 2012. (Tr. at 15). Her claims were denied initially and upon reconsideration. *Id*. After conducting a hearing, the Administrative Law Judge ("ALJ") denied Baldwin's application. (Tr. at 28). The Appeals Council denied her request for review. (Tr. at 1). The ALJ's decision now stands as the final decision of the Commissioner, and Baldwin has requested judicial review.

For the reasons stated below, the Court[1] reverses the ALJ's decision and remands for further review.

---

[1] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge.

## II. The Commissioner's Decision:

The ALJ found that Baldwin had not engaged in substantial gainful activity since the alleged onset date of December 28, 2012. (Tr. at 17). At Step Two, the ALJ found that Baldwin has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, status post bilateral hip replacement, obesity, diabetes, depression, and anxiety. *Id*.

After finding that Baldwin's impairments did not meet or equal a listed impairment (Tr. at 21), the ALJ determined that Baldwin had the residual functional capacity ("RFC") to perform the full range of sedentary work. (Tr. at 22). Next, the ALJ found that Baldwin was unable to perform any past relevant work. (Tr. at 26). Based on Baldwin's age, education, work experience, and RFC, the ALJ relied on Rule 201.28 of the Medical-Vocational Guidelines to find that Baldwin was not disabled.[2] (Tr. at 27).

## III. Discussion:

### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether

---

[2] If a claimant can perform all of the exertional demands at a given level of exertion (in this case, sedentary), then the ALJ consults the Medical-Vocational Guidelines, a set of rules that render a finding of disabled or not disabled based on a claimant's specific vocational profile. 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 83-11.

2

it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

B. Baldwin's Arguments on Appeal

Baldwin argues that substantial evidence does not support the ALJ's decision to deny benefits. She contends that the RFC was not reflective of her limitations because she could not engage in prolonged sitting and was limited in her ability to reach. She also asserts that the ALJ's credibility analysis was flawed.

A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's [RFC], the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of [his] impairments. *Wildman v. Astrue*, 596 F.3d

959, 969 (8th Cir. 2010); *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996). The ALJ bears the primary responsibility for determining a claimant's RFC. *Wildman*, 596 F.3d at 969.

The medical evidence supports Baldwin's claim that she is more limited than found by the ALJ in arriving at her RFC. As early as January 2011, Baldwin began seeing Amy Swift-Johnson, M.D., for back pain. She diagnosed Baldwin with sciatic pain. (Tr. at 387-400). In November 2011, Antao Du, M.D., saw Baldwin for chronic back pain and referred her for a lumbar MRI, nerve conduction study, and physical therapy. (Tr. at 438-439). On December 22, 2011, Baldwin returned to Dr. Du and told him that her pain was worse and was radiating to her right leg, and that she was dropping things. (Tr. at 435). He diagnosed chronic low back pain and carpal tunnel syndrome. (Tr. at 436). On April 18, 2012, Dr. Du found tenderness in Baldwin's neck and low back and a positive Tinel's sign.[3] *Id*. He noted that Baldwin had a limping gait. (Tr. at 434). He prescribed Neurontin and Naprosyn. *Id*.

A lumbar MRI taken on May 4, 2012 showed a broad-based central disc protrusion at the T12-L1 level and a minimal annular disc bulge at the L1-L2 level.

---

[3]Tinel's sign is a way to detect irritated nerves. The test is positive when there is pressure neuropathy of the nerve, like in the foot or ankle, or in the hand. When the nerve is not trapped behind a structure there will be a negative test and the patient will feel no pain. When the nerve is trapped, the patient will feel tingling in the distal area. https://www.physio-pedia.com/Tinel%E2%80%99s_Test

(Tr. at 500-501). A nerve conduction study, also from May 2012, showed marked sensorimotor median mononeuropathy at the wrists, which Dr. Du interpreted as "severe carpal tunnel syndrome bilaterally." (Tr. at 427-432). He also diagnosed thoracic and lumbar spondylosis. (Tr. at 428). He renewed the pain medications and prescribed bilateral wrist braces. *Id.*

A thoracic MRI was performed on January 11, 2013. (Tr. at 496-497). It showed central disc extrusion and caudal extension at C6-C7 with involvement of the thecal sac, and diffuse disc bulge at the mid-to-low thoracic levels. *Id*. An MRI of the lumbar spine showed narrowing of the central canal and bulging at L1-L2. *Id*.

Baldwin saw Sheri Dewan, M.D., a neurosurgeon, on January 22, 2013 and reported back and leg pain with significant difficulty ambulating. (Tr. at 423-424). Dr. Dewan diagnosed lumbar and cervical spondylosis, referred her for a cervical MRI, and suggested steroid injections. *Id*. She prescribed Flexeril. *Id*.

A January 2013 cervical MRI showed mild to moderate multilevel degenerative disc disease and mild cervical lymphadenopathy. (Tr. at 420-421). Dr. Dewan diagnosed multilevel cervical stenosis on March 5, 2013. (Tr. at 418).

Baldwin underwent another lumbar MRI on April 10, 2013, which showed a lumbarized vertebral body with minimal posterior disc bulges at T12-L1 and L1-L2, with indentation of the thecal sac at each level. (Tr. at 415-416). On April 24, 2013,

Baldwin told Dr. Swift-Johnson that back injections, chiropractic care, and physical therapy were not helping. (Tr. at 411-412). She had pain with all motion in her back, severely decreased motion in her back and legs, and an ataxic gait. *Id*. Dr. Swift-Johnson referred her for a neurosurgery consult. (Tr. at 412).

On August 6, 2013, Baldwin was seen by James Atchison, D.O., at the Rehabilitation Institute of Chicago's Center for Pain Management. (Tr. at 485-495). Exam showed fibromyalgia tender points in the bilateral cervical regions, pain with cervical range of motion, limited range of motion in the lumbar spine, pain with hip flexion, decreased sensation at L3-L5, postural abnormalities, and neuropathic pain. (Tr. at 492-495).

At two visits in October 2013 – one with Dr. Atchison and one with a rheumatologist, Darcy Majka, M.D. -- Baldwin presented with pain in her legs and low back. (Tr. at 463-467, 560-566). She walked with an antalgic gait and was diagnosed with myofascial pain. (Tr. at 466, 563-64).

On March 10, 2014, Baldwin underwent an occupational therapy evaluation. (Tr. at 603-609). She was assessed with deficits in balance, coordination, endurance, mobility, range of motion, tolerance for standing and sitting, and basic activity of daily living. (Tr. at 614). She had poor body mechanics in reaching, carrying, stooping, and bending. *Id.* Baldwin said she could sit for a total of 60 minutes and

6

stand for a total of 20 minutes. (Tr. at 610).

On April 26, 2014, Baldwin saw Jorge Aliago, M.D., for a consultative examination. (Tr. at 643-648). He found decreased range of motion in the lumbosacral spine, and positive straight-leg raise bilaterally. (Tr. at 647). She walked with a limp and was unable to do heel-toe walk or tandem gait. *Id*. Squatting and arising were done with moderate difficulty. *Id*. She was unable to do single leg balance. *Id*.

In 2015, Baldwin developed aseptic necrosis of head and neck of femur (hip collapse), and was prescribed pain medications and a wheelchair. (Tr. at 661-679, 826-839, 1082-1098). She underwent bilateral hip replacements, and seemed to improve post-surgery. *Id*.

On August 31, 2015, Baldwin presented with decreased range of motion in her cervical spine, joint line pain, limping, lower extremity peri-patellar tenderness, significant muscle spasm, flattened lordosis, myofascial trigger points, and stiffness in her lumbar spine. (Tr. at 654-657). She continued on pain medications and had a steroid injection. *Id*.

Baldwin underwent a final cervical MRI on September 21, 2015, which revealed multilevel spinal stenosis, bilateral neural foraminal narrowing, disc herniations, and disc protrusions. (Tr. at 682-683).

On October 12, 2015, Darrell Hutchinson, M.D., whom Baldwin had seen throughout 2015, completed a medical source statement. (Tr. at 947-949). He noted she walked on crutches. (Tr. at 947). He said she could sit less than two hours in an eight-hour day. *Id*. He limited her reaching, fingering, and handling. (Tr. at 948). He said she would miss more than three days of work per month. *Id.* He said she had not responded well to physical therapy and would be limited in her ability to ambulate. (Tr. at 949). She still required narcotic pain medications. *Id*.

On June 7, 2016, state-agency medical examiner Barry Burchett, M.D., performed a consultative evaluation on Baldwin. He found numbness in her left forearm and hand, with recurrent spasms in her left arm and leg. (Tr. at 1103). He found full range of motion of the cervical spine and negative straight-leg raise bilaterally. *Id.* But he concluded that Baldwin could not reach overhead with her right hand and could never reach, handle, finger, feel, push, or pull with her left hand. (Tr. at 1109). She could never climb stairs, ramps, ladders, or scaffolds, or stoop. (Tr. at 1110). Dr. Burchett found that Baldwin could sit, stand, and walk for one hour continuously, and for four hours each in an eight-hour day. (Tr. at 1108). He said she would need to change positions frequently. *Id*.

If the ALJ had relied solely on the agency's own medical consultant, Dr. Burchett, he would have been required to find postural limitations requiring a more

restrictive RFC, *i.e.*, upper extremity restrictions and the need to change positions, which would prevent Baldwin from performing the full range of sedentary work. Furthermore, if the ALJ had given the required weight to the wealth of objective medical imaging showing significant compromise of Baldwin's back and neck, and the two well-founded medical source statements from treating physicians, it should have been clear to him that his RFC determination was unsupported by the overwhelming weight of the medical evidence.

Baldwin sought consistent treatment, underwent steroid injections, was treated with strong narcotics, underwent physical therapy and chiropractic care, and sought out pain management specialists. Aggressive treatment weighs in favor of a finding of disability. *See Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) (a consistent diagnosis of chronic pain, coupled with a long history of pain management and drug therapy, supports allegations of disabling pain). Baldwin indicated that her family helps her with cooking and laundry, and she needs help getting her kids in and out of the car. (Tr. at 269-270). She gets stiff when standing or lying down for too long, and she occasionally uses a walker. (Tr. at 53-54). Baldwin said she is supposed to have a nurse's aide come to her house to help with chores. (Tr. at 55). Pain has compromised Baldwin's ability to lead a normal life, and that pain was well documented in the medical evidence.

9

It is worth noting that the ALJ did not ask any hypothetical questions of the VE. Instead, he relied on Rule 201.28 of the Medical Vocational Guidelines to reach a finding of "not-disabled." (Tr. at 27). An ALJ is permitted to consult the Guidelines when a claimant can perform the *full range* of work at any of the exertional levels. However, "where the claimant suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational Guidelines." *Baker v. Barnhart*, 457 F.3d 882, 894 (8th Cir. 2006). Testimony from a vocational expert "is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007).

So did Baldwin suffer from pain sufficient to erode her capacity to perform the full range of sedentary work? That is a question that must be answered to determine if vocational testimony was required, and that question is resolved by applying an analysis of whether subjective complaints are credible. Before coming to a conclusion on a claimant's credibility, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including prior work record, as well as observations by third parties and treating and examining physicians regarding: 1) the claimant's daily activities; 2) the duration, frequency,

and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 751 F.2d 943, 948 (8th Cir. 1984).

Social Security Ruling 16-3p, 2016 SSR LEXIS 4, removed the word "credibility" from the analysis of a claimant's subjective complaints, replacing it with "consistency" of a claimant's allegations with other evidence. SSR 16-3p became effective on March 28, 2016, before the hearing decision date in this case of August 1, 2016, but the underlying analysis still incorporates the same factors discussed in *Polaski* and requires the ALJ to make a determination based on all evidence in the record. *Martsolf v. Colvin*, No. 6: 16-cv-00348-NKL, 2017 U.S. Dist. LEXIS 2748 (W.D. Mo. Jan. 9, 2017). SSR 16-3p also expressly provides that the ALJ may not make conclusory statements about having considered the symptoms, or merely recite the factors described in the regulations. *Palmer v. Colvin*, 2017 U.S. Dist. LEXIS 41 *22 (W.D. Mo. Jan. 3, 2017). Rather, the determination must contain specific reasons for the weight given to the individual's symptoms, be consistent, and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. *Id.*, 81 F.R. 14171.

The ALJ in this case did not reference *Polaski*. He did not mention SSR 16-

3p. He did not discuss the factors required under either analysis. He gave no reasons for dispatching with Baldwin's subjective complaints. Because the ALJ did not follow the steps necessary for evaluating Baldwin's complaints of pain, the Court finds that reversal is required.

## IV. Conclusion:

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477. The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing. For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence. The ALJ erred by not including all of Baldwin's limitations in the RFC, and he did not conduct a proper analysis of subjective complaints.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is REVERSED and the case is REMANDED for further review.

DATED this 7th day of December, 2017.

_____
UNITED STATES MAGISTRATE JUDGE